HURLEY, Judge,
dissenting.
Today the majority upholds a warrantless vehicle search based upon hearsay information from a confidential informant who failed to divulge the source of his information. In my view the tip lacked substantial independent indicia of reliability and therefore I conclude the search of the vehicle fell below constitutionally mandated norms. I would reverse.
On December 20, 1977, at approximately 5:00 P. M., a confidential informant walked into the ■ Jupiter police station. He told Officer Woodard that the defendant, Jenkins, was driving a brown Oldsmobile and would be leaving town with some drugs in his car. The informant went on to say that the vehicle was being repaired at a Gulf service station. With this information the police launched their investigation. Officer Bachman described his initial activities: “ . . .1 checked with*the manager of that particular station in an attempt to find the vehicle or anyone who knew anything about it. This all proved negative as well as checking with the mechanic who worked for that station . .”
Approximately an hour later, the same confidential informant reentered the Jupiter police station and told Officer Woodard that Jenkins was leaving the parking lot of an apartment building located at the corner of First and Old Dixie Highway. He said that drugs were contained in a brown paper bag located on the front seat or front floorboard section of the vehicle. The police went to the designated location and saw Jenkins driving away. They followed and stopped him. They seized a brown paper bag from the right front floorboard section of the vehicle; it contained marijuana, a quantity of amphetamine pills, and a quantity of cocaine.
Jenkins moved to suppress the evidence. At the motion hearing, Officer Woodard testified that with the exception of what he had been told by Officer Bachman, he had no knowledge of the informant’s past reliability. As to the source of the informant’s present information, he responded as follows:
Q. In your conversation with the Cl at the station, did he indicate how he knew the information or how he had obtained the information he was relating to you?
A. No, he didn’t.
Q. You just accepted what he was saying as true?
A. Yes.
Q. He didn’t say he had personally seen the bag or anything like that?
*84 A. No. He didn’t say he had personally seen the bag.
All of the testimony on the informant’s past reliability came from Officer Bachman. His testimony,[1] vacillating and contradictory as it was, is accepted here in the light most favorable to sustain the trial court’s ruling. McNamara v. State, 357 So.2d 410 (Fla.1978). This is done despite the fact that the trial court expressly rejected Bach-man’s claim that the bag was open with its contents in plain view.
Section 933.19, Florida Statutes (1979), adopts the rule formulated in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), which permits a warrant-less search of a motor vehicle on the open highway where there is probable cause to believe that the vehicle contains contraband. Samuels v. State, 318 So.2d 190 (Fla.2d DCA 1975), cert, denied, 330 So.2d 21 (Fla.1976). The requisite element of probable cause may be satisfied by hearsay information. Aguilar v. Texas, 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964). Indeed, hearsay may be supplied by a confidential informant whose identity need not. be disclosed. United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); Aguilar v. Texas, supra; Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); State v. Maier, 366 So.2d 501 (Fla.lst DCA 1979); State v. Katz, 295 So.2d 356 (Fla.4th DCA 1974).
*85 When a confidential informant is utilized, however, the police must demonstrate (1) that the informant is credible, and (2) that his information is reliable. State v. Bond, 341 So.2d 218 (Fla.2nd DCA 1976), cert, denied 348 So.2d 953 (Fla.1977). This is commonly known as the “ ‘two-pronged’ Spinelli-Aguilar test”, described in Davis v. State, 346 So.2d 141, 142 (Fla.lst DCA 1977), cert, denied 353 So.2d 679 (Fla.1977):
In Aguilar v. Texas, . . ., and Spi-nelli v. United States, . ., the United States Supreme Court established a “two-pronged” test for sufficiency of affidavits for search warrants relying on information obtained from an informant. That test requires first that affiant state how the informer gained his information so that the magistrate can determine if the underlying circumstances justify a conclusion that probable cause for a search exists. Secondly, the magistrate must be provided with the reasons from which the affiant concludes the informant is reliable. (Citations omitted.)
In our case, one of the Spinelli-Aguilar tests is wholly unsatisfied. We have no idea how the informant obtained his information. It is not alleged that he personally observed the drugs in Jenkins’ possession nor that he viewed the contents of the bag. Where a tip does not contain a sufficient statement of the underlying circumstances from which the informant concluded that the defendant was violating the law, the court must resort to a secondary evaluative process which was outlined by Mr. Justice Harlan in Spinelli, supra:
In the absence of a statement detailing the manner in which the information was gathered, it is especially important that the tip describe the accused’s criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual’s general reputation.
The detail provided by the informant in Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959) provides a suitable benchmark. 393 U.S. at 416, 89 S.Ct. at 589.
Draper, it will be remembered is the case in which a police officer was told by an informant, known to the police officer to be reliable, that a man of a certain description would get off a certain train with a specified amount of heroin in his possession. The quantity of detail in the tip was overwhelming. So much so, that it was readily “ . . . apparent that the informant had not been fabricating his report out of whole cloth; since the report was of the sort which in common experience may be recognized as having been obtained in a reliable way, it was perfectly clear that probable cause had been established.” Id. at 417-418, 89 S.Ct. at 590.
Draper, then, is a “benchmark” having constitutional significance and so it is worth recounting the amount and specificity of detail present in the Draper tip. The informant said,
“ . . . that Draper had gone to Chicago the day before [September 6] by train [and] that he was going to bring back three ounces of heroin [and] that he would return to Denver either on the morning of the 8th of September or the morning of the 9th of September also by train.” 358 U.S. at 309, 79 S.Ct. at 331.
Saying that Draper would be carrying “a tan zipper bag,” and that he habitually “walked real fast,” the informant gave the following physical description of Draper and of the clothes which he was wearing:
“ . . Draper was a Negro of light brown complexion, 27 years of age, 5 feet 8 inches tall, weighed about 160 pounds, and that he was wearing a light colored raincoat, brown slacks and black shoes.” 358 U.S. at 309 n.2, 79 S.Ct. at 331 n.2.
I do not suggest there has to be a “mathematical match-up” in order to satisfy Draper,. but there must be an equivalent degree of reliability. Draper, after all, is a substitute method of evaluation. It is less favored than the Spinelli-Aguilar approach for it forces us to garner indirectly what Spinneli-Aguilar provides outright — evidence of reliability. Therefore, Draper *86 must be applied with a careful and exacting eye. In our own case, a simple back-to-back comparison illustrates the inadequacy of the Jenkins tip.
DRAPER_JENKINS
(1) Type of drug: Heroin. (1) According to the first officer who received the tip the type of drugs was unknown. According to the second officer (Bach-man) the type of drugs was “marijuana and some other drugs.”
(2) Amount of drugs: (2) 3 ounces. Amount - Unknown.
(3) Source of drugs: (3) Chicago. Unknown.
(4) Mode of transportation: (4) Train. Brown Oldsmobile.
(5) Location: (5) Train station. The first information about the Gulf station proved to be incorrect. The second information regarding the apartment house parking lot was correct.
(6) Name of defendant: Draper. (6) Informant named Jenkins.
(7) Physical description. (7) None.
(8) Clothing description. (8) None.
(9) Personal habits: Walked fast. (9) None.
(10) Special items: (10) Brown paper bag.
Tan zipper bag.
There is an understandable inclination to refrain from overly critical analysis in matters of this kind. Courts are, and ought to be, sensitive to the charge of “nit-picking”, of dissecting and second-guessing difficult on-the-spot decisions. Yet the search below was without a warrant which raises immediate concern. “ . . . [Sjearches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions.” Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514,19 L.Ed.2d 576 (1967); Norman v. State, 379 So.2d 643 (Fla.1980). We also proceed under the correlative principle that probable cause must be determined by a “neutral and detached magistrate,” and not by “the officer engaged in the often competitive enterprise of ferreting out crime.” Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). Indeed, neither a magistrate nor an appellate court can “be said to have properly discharged [their] constitutional duty if [they] [rely] on an informer’s tip which — even when partially corroborated— is not as reliable as one which passes Aguilar’s requirement when standing alone.” Spinelli, supra, 393 U.S. at 415-416, 89 S.Ct. at 589.
Thus we find ourselves in an after-the-fact inquiry. At the outset we note that the informant’s first tip that “ . . the vehicle was being repaired at a Gulf service station during the day . . .,” was incorrect. The police went to the service station and talked with the manager and the mechanic. Neither was able to corroborate this information. So we begin with an informant who has not supplied useful information to the police officers in this case for a substantial period of time (one, two, or perhaps even three years), and whose initial information is wrong.
The second installment is equally unsatisfying — more for what it lacks than for the little it provides. True, the informant indicated (a) the name of the defendant, (b) the make and color of the car, (c) its location, and (d) where and in what the drugs were contained. But he failed to supply easily ascertainable detail which would have shown that his information was recent and reliable. For example, he did not relate any portion of Jenkins’ license tag number. Secondly, there is no testimony that the police knew Jenkins. Thus it would have been useful to have his physical description plus a description of the clothes which he was wearing. The latter would have verified that the informant had seen Jenkins on the day in question. Also, there was no information about the passenger in the vehicle — (a) that he was there, (b) his physical description or, (c) a description of his clothing.
The information about the type of drugs was either nonexistent or vague. Officer Woodard, who actually received the tip, testified that the informant said Jenkins had “ . . . some narcotics in a paper bag *87 . It was Officer Bachman, the second-hand recipient of the tip, who testified that the informant said Jenkins “ . . had marijuana and some other narcotics, other drugs in the vehicle.” Compared with the specificity in Draper (three ounces of heroin), the information here is meager and imprecise. The record reveals that Jenkins possessed a quantity of marijuana, at least thirty-four red and black “capsule type” amphetamine pills and two “lids” of cocaine. Presumably, the informant would have known the type and approximate amount of drugs if he had first-hand or otherwise reliable knowledge. In retrospect, it is clear there was an abundance of corroborative detail which the informant could have, but failed to relate to the police.
The question, then, is posed, did the police observations sufficiently corroborate the tip so as to cure its deficiencies? In this respect, our case bears similarity to United States v. Larkin, 510 F.2d 13 (9th Cir. 1974). There the police received a radio dispatch that a 1972 black on blue GMC “blazer-type” vehicle, with an identified license plate number, would be proceeding from El Centro toward Los Angeles carrying heroin and marijuana. The tip came from an informant whose reliability was not proved and the dependability of whose information was not established. Nevertheless the government argued that the police corroboration supplemented and cured any deficiencies in the tip. The court rejected this argument, saying:
Nothing about the described features of the car or its direction points to anything suspicious, let alone criminal. That a vehicle matching the description was spotted, along a highway from El Centro in the general direction of Los Angeles corroborates nothing except, possibly, the ability of the informant accurately to relay what he has seen or what he has overheard. No hint is given thereby that the informant was truthful in reporting that the vehicle contained contraband. Nor does the observation supply any information about how the informant knew that contraband was being transported. The fact that these few innocuous details tallied with the officers’ observations cannot “be said to support both the inference that the informer was generally trustworthy and that he had made his charge against [Larkin] on the basis of information obtained in a reliable way. 510 F.2d at 15, quoting from Spineiii, supra at 417, 89 S.Ct. at 589.
So too in the case at bar. The Jupiter police were able to corroborate only “innocent-seeming conduct” which failed to cure the tip’s congenital deficiencies. In assessing the worth of police corroboration, each case must be judged on its own facts. See, e. g., Tucker v. State, 283 So.2d 128 (Fla.2d DCA 1973), cert, denied, 291 So.2d 11 (Fla. 1974). There is no consensus on what type of information is required to corroborate an informant’s tip and there are instances where an accumulation of innocent-seeming detail conforming to the original tip will have real corroborative value. See, e. g., St. John v. State, 356 So.2d 32 (Fla.lst DCA 1978) and United States v. Holliday, 474 F.2d 320 (10th Cir. 1973). Nevertheless, “ . . . it is generally agreed that the better practice is to obtain corroboration of incriminating details.” United States v. Brennan, 538 F.2d 711, 720 (5th Cir. 1976), cert, denied, 429 U.S. 1092, 97 S.Ct. 1104, 51 L.Ed.2d 538 (1977), reh. denied, 430 U.S. 960, 97 S.Ct. 1611, 51 L.Ed.2d 812 (1977).
Thus, as I see it, we are left with a tip which was deficient from the start and which does not support a finding of probable cause. The focus of this inquiry has centered on the facts leading to the search and has excluded any consideration of the defendant’s guilt. That is the absolute duty of this court. The rationale and ultimate value for such an approach was set forth by the late Mr. Justice Douglas in his dissenting opinion in Draper, supra.
Decisions under the Fourth Amendment, taken in the long view, have not given the protection ■ to the citizen which the letter and spirit of the Amendment would seem to require. One reason, I think, is that wherever a culprit is caught red-handed as in leading Fourth Amendment *88 cases, it is difficult to adopt and enforce a rule that would turn him loose. A rule protective of law-abiding citizens is not apt to flourish where, its advocates are usually criminals. Yet the rule we fashion is for the innocent and guilty alike. If the word of the informer on which the present arrest was made is sufficient to make the arrest legal, his word would also protect the police who, acting on it, hauled the innocent citizen off to jail. 358 U.S. at 314-315, 79 S.Ct. at 333-334.
In summary, I suggest that the paucity of detail in the Jenkins tip renders it incapable of meeting the Draper “benchmark”. The information about alternate locations of the drugs within the vehicle hints at credibility, but I do not think we can say with any reasonable degree of probability that this information was reliable as opposed to being “ . . .an offhand remark heard at a neighborhood bar.” Spinelli, supra at 417, 89 S.Ct. at 589. Reliability remains the critical test. Had the police asked the elementary question, “How did you obtain your information?”, the deficiency, in all likelihood, would have been cured. This court, however, should not allow substandard police work to result in the dilution of an important Fourth Amendment safeguard. For these reasons I would reverse.

. Officer Bachman testified in this fashion:
Q. Had you had any prior dealings with this confidential informant in the past?
A. Yes, ma’am.
Q. Had any of his information proved to be reliable in the past?
A. Yes.
Q. Could you tell us—
A. Let me go back on that. I worked with my partner, if I recall, on a case, I’m not sure how much longer it was, I don’t recall before this particular incident and it was known to me that he had been a good and reliable confidential informant on other past cases.
Q. Had you used him before?
A. I don’t think so. I don’t recall.
Q. Did you recognize the name of the confidential informant that Sergeant Woodard told you?
A. Oh, yes. Very well.
Q. Had you ever personally had any dealings with him regarding any police cases?
A. I believe so, but I don’t recall. It has been a few years since the cases that involved this individual that I worked took place. 1 don’t honestly recall. I think I did, but I’m not positive.
Q. All right. Then given your indirect involvement with this confidential informant, how many cases have you used him or been involved with him before?
A. If I recall correctly, it was probably two or three.
Q. Here today, do you now recall whether or not you have ever spoken to that confidential informant prior to the date you stopped Mr. Jenkins in the car?
A. I don’t recall.
I believe you mentioned two or three cases that you had worked with this informant directly, is that correct? o'
I know of two or three cases. I’m not sure if 1 worked on all three or both of them, but I know I have worked on at least one and possibly two. <
Do you know when these cases were?
They were at least two years ago, possibly three. I’m not quite certain.
Q. During the year preceding this stop of the vehicle we are talking about, had you used the Cl or were you aware of anyone in your department using the Cl?
A. Yes, sir.
Q. Okay. Page 12 of that same deposition, quoting from line, starting at line 13, “Question: On what occasion and what type of information?” “Answer: It was a previous narcotics case. Question: How many times? Answer: I’m not sure if it was one or two. It has been quite some time. Question: How long ago or how long prior to December 20th? Answer: At least a year. Question: Are you saying it had been at least a year since you had any knowledge of the confidential informant’s activities with the police department or had been at least a year that the confidential informant had given any information to anyone whatsoever at the Jupiter Police Department?”
At that time you believe, and I’m not quoting from the deposition, but at that time you indicated it had been at least a year, is that correct?
A. Apparently, if that’s what you are reading.